UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BUNNIE M. GASPERINI,   \*

       Plaintiff,   \*

                 \*    Civil Action No. 1:10-cv-11246-JCB

        v.        \*

DOMINION ENERGY    \*

NEW ENGLAND INC.,    \*

                 \*

      Defendant.   \*

                 \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Bunnie M. Gasperini, respectfully submits this memorandum of law in support of her opposition to the Defendant's motion for summary judgment as to all remaining counts of her Complaint.

**<u>Factual and Procedural Background</u>**

On or about April 14, 2010, Plaintiff, Bunnie M. Gasperini, (hereinafter "Ms. Gasperini") brought this suit against defendant Dominion Energy New England, Inc. (hereinafter "Company") in Bristol Superior Court, alleging violations of Mass. Gen. Laws Chapter 151B, specifically, the violation of her right to be free from gender discrimination and her right to be free from retaliation. (Count I).  Further, Ms. Gasperini alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, specifically gender discrimination and retaliation (Count II).  Counts III and IV were subsequently dismissed by this Honorable Court.

1

On or about July 26, 2010, Company filed a Notice of Removal to this federal court, which this court subsequently approved.

## ARGUMENT
### Summary Judgment Standard

"Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).  "[A] 'genuine' issue exists if the evidence is such that a reasonable fact finder could return a judgment in favor of the nonmoving party.  Celotex v. Catrett, 477 U.S. at 322-323; Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." American Steel Erectors, Inc. v. Local Union No.7, Int. Assoc. of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008); See also, Espinal v. National Grid NE Holdings, 794 F.Supp.2d 285 (2011) quoting Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986) ("A 'genuine issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case.")  Reviewing all of the evidence in the record as a whole, see Reeves v. Sanderson Plumbing, 530 U.S. 133, 150-151 (2000), the court draws all reasonable inference in favor of the nonmoving party. Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000).

Initially, the burden of production is upon the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, which it believes to demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. at 323.

"The non-movant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Iverson v. City of Bos., 452 F.3d 94, 98 (1st Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. at 322-24.)  However, "a conglomeration of conclusory allegations, improbable inferences, and unsupported

speculation is insufficient to discharge the nonmovant's burden." DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)) (internal quotation marks omitted). Rather, "the party seeking to avoid summary judgment 'must be able to point to specific, competent evidence to support his claim.'" Soto-Ocasio v. Fed. Exp. Corp., 150 F.3d 14, 18 (1st Cir. 1998).

Both the moving and the nonmoving party must support their assertions regarding whether a particular fact is disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1).

Moreover, in cases such as the case at bar, where employment discrimination is claimed, courts should "exercise particular caution before granting summary judgment for [the] employer on such issues as pretext, motive and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000); accord Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir 1988) (recognizing in sex discrimination case that summary judgment 'test remains particularly rigorous when the disputed issue turns on a question of motive or intent').

## I.   Genuine Issues of Material Fact Exist Regarding Plaintiff's Gender Discrimination Claim

### A.   Gender Discrimination

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated. Harris v. Forklifts Sys., Inc., 50 U.S. 17 at 21 (1993)  "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Meritor Savings Bank, FSB v. Vinson, 477 U.S. at 23 (1986).

To determine whether a plaintiff has successfully established a discrimination claim, federal and state courts rely on the burden-shifting analysis set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1979) and <u>Texas Dept. of Comm. Affairs v. Burdine,</u> 450 U.S. 248, 253-254 (1981)  This framework governs both state and federal discrimination claims. See <u>Douglas v. J.C. Penney Co., Inc.</u>, 422 F.Supp.2d 260, 272 (D.Mass. 2006).  See also, <u>Conward v. Cambridge Sch.Comm.</u>, 171 F.3d 12, 19 (1st Cir.1999); <u>Abramian v. President & Fellows of Harvard Coll.</u>, 432 Mass. 107, 116 (2000).

At the first step, a plaintiff must adduce a prima facie case of discrimination, showing that: (1) he is a member of a protected class; (2) he was performing at an adequate level; and (3) he suffered an adverse employment action.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext" <u>Tardanico v. Aetna Life & Cas. Co.</u> 41 Mass.App.Ct. 443, 448 (1996).   "If the employer passes the test, a plaintiff must come forward with evidence showing that the employer's proffered reason is a pretext and that a discriminatory animus was at the heart of the employer's actions." <u>Espinal</u>, 794 F.Supp.2d 285 (2011)  In assessing pretext, a court's 'focus must be on the perception of the decision maker', that is, whether the employer believed its stated reason to be credible." <u>Mesnick v. Gen. Elec. Co.</u> 950 F.2d 816, 824 (1st Cir. 1991).

"Despite these shifting burdens of production, the plaintiff throughout retains the burden of persuasion." <u>Espinal</u>, 794 F.Supp.2d at 292 quoting <u>Conward</u>, 171 F.3d at 19.

"[T]he state standard under chapter 151B is more favorable to [a] plaintiff in the area of pretext and the ultimate showing of discriminatory intent.  '[O]nce a plaintiff has established a prima facie case and further shows either that the employer's articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recovery for illegal discrimination under G.L. c. 151B.'" <u>Pearson v. Mass. Bay Transportation Authority</u>, 2012 U.S. Dist.  LEXIS 31101 at 33 (2012) quoting  <u>Blare v. Husky Inj. Molding Systems, Boston, Inc.</u>, 419 Mass. 437 (Mass. 1995).

**a. Plaintiff was a Member of a Protected Class.**

There is no doubt that Ms. Gasperini, being female, easily satisfies the first element required to establish her prima facie case.  As a female, Ms. Gasperini is a member of a protected class under both Mass.Gen.L. c. § 4(1) and Title VII.  See 42 U.S. C. § 2000(e).

**b. Plaintiff was Meeting Company's Legitimate Expectations**

The plaintiff had a long employment history with the Company's predecessor and Company spanning approximately eighteen years.  During this time period, Ms. Gasperini was considered a valued employee, and generally performed her job at an acceptable level, despite occasional workplace mishaps resulting in minor disciplinary measures, some of which Ms. Gasperini contests were retaliatory.

Ms. Gasperini was considered a "good worker" by her supervisor, Antero Oliveira. DMF ¶5.  Antero Oliveira also believed Ms. Gasperini was good and competent at operating the bulldozer, and performed those duties well.  DMF ¶6.

Ms. Gasperini coped with challenges of Post-Traumatic Stress Disorder (PTSD) and Anxiety.  DMG ¶84.  Ms. Gasperini occasionally found it difficult to manage stressful workplace incidents with co-workers in an appropriate manner.  DMF ¶1.  However, contrary to Company's characterization of her, Ms. Gasperini was not the kind of person who would ever connive a discrimination matter in order to obtain a summer house.  She was characterized as a "truthful" person by both her supervisor and union representative. DMF ¶3.  Her therapy records indicated that she was a devout Christian, providing volunteer hospice outreach in her free time. DMF ¶4.

Ms. Gasperini never intentionally talked about her prior lawsuit and subsequent settlement with Company's predecessor.  DMF ¶7.  Her supervisor, Antero Oliveira never heard Ms. Gasperini say that she needed a summer house and or that she would be willing to sue Company. DMF ¶9.  Michael Alexander never heard Ms. Gasperini discussing her prior lawsuit with anyone. DMF ¶10.  Contrary to Company's assertions, and to the extent it is even relevant, Ms. Gasperini did not purchase her present home with proceeds from her settlement with Company's predecessor. DMF ¶12.

To the extent that Company attempts to argue that Ms. Gasperini's work performance was unsatisfactory, it is generally recognized that this issue is not one of law, and should not be decided at a summary judgment stage. "Whether an employee is performing his job satisfactorily is a question of fact for the jury." Espinal v. National Grid NE Holdings, 794 F.Supp.2d at, 292 citing Boothby v. Exon, Inc., 414 Mass. 468, 481 (1993).

Given the stated facts in light most favorable to Ms. Gasperini as the non-movant party, whether Ms. Gasperini met the legitimate expectations of her employer should be settled in her favor at this stage.

### c.  Plaintiff was Subject to Adverse Employment Action

"An adverse employment action is a 'tak[ing] of something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or withold[ing] from the employee an accouterment of the employment relationship." Espinal, 794 F.Supp.2d at 293 quoting Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996).

"An adverse employment action must be something of a concrete nature that materially disadvantages a plaintiff." Espinal, 794 F.Supp.2d at 296, citing LaRou v. Ridlon, 98 F.3d 659, 664 (1st Cir. 1996); MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996).

Ms. Gasperini was a fuel handler at a coal company. Aside from seeing an occasional female, Ms. Gasperini worked with all males. DMF ¶14. Working in a predominately male culture for a span of eighteen years, she necessarily let a lot of things go. For instance, to Ms. Gasperini's exclusion, her male co-workers would routinely meet and decide among themselves who would get overtime DMF ¶115. Ms. Gasperini witnessed another co-worker, Mark Huck, stick out his rear-end and pass gas in front of a supervisor, Antero Oliveira, with no repercussions. DMF ¶113. She witnessed that same co-worker swear in front of supervisors on many occasions without reprimand. DMF ¶116. On one occasion, a male co-worker belittled her with a comment "that's all I think you're capable of understanding" DMF ¶119. Ms. Gasperini's former co-worker Janice Weakly, who worked at Company for fourteen years admitted that it was difficult because males did not want to train females or because they would swear. DMF ¶2. Ms. Gasperini experienced an incident where a male co-worker did not want

to train her on the DRAVO.  DMF ¶114. Ms. Gasperini witnessed many instances where her male co-workers left their assigned work stations with no reprimands. DMF ¶117. On one occasion, Ms. Gasperini complained to the safety department because a bulldozer had no function lights and she was told by her supervisor Antero Oliveira not to go to safety again. DMF ¶118.  Despite this difficult male-dominated culture, Ms. Gasperini did her best to work in this environment for eighteen years.  It was not until she became the victim of very specific adverse Company actions, that she could no longer tolerate her disparate work conditions.

Although Company attempts to suggest Ms. Gasperini's contentions are unfounded and she just wants to get "a summer house" out of her suit, Ms. Gasperini's anguish and physical symptomology due to the conditions of employment when she left is unrefuted.  DMF ¶¶85-87, 111, 116-117, 121. When she left on medical leave, it was always her intent to return to work. DMF ¶121.  However, because the course of events affected her emotional and physical state so profoundly she was completely unable to return. DMF ¶121

Company's adverse employment actions were in the form of the disparate treatment Ms. Gasperni suffered in the terms and conditions of her employment precisely because she was female.  First, Ms. Gasperini experienced unequal treatment throughout her employment with Company because she was denied the opportunity to eat with her co-workers who were all male.  Ms. Gasperini generally worked the 3p.m.-11 p.m.(2nd) shift in fuel handling department. DMF ¶13.  Ms. Gasperini's fuel handling department co-workers on second shift were all male. DMF ¶14.  The fuel handlers all took their twenty minute meal breaks together at the same time in the male-only lunch room. DMF ¶15.  The male-only lunch room was located in the male locker room.  DMF ¶17.  If Ms. Gasperini was to eat at any other available lunch room, she would eat alone as there were no other females on her shift. DMF ¶¶18, 19. Ms. Gasperini was systemically isolated and excluded from her co-workers who were all male, precisely because the defendant failed to provide an eating/break area where she could join co-workers without the threat of being fired.  DMF ¶¶20, 21-22, 23,25.  That Ms. Gasperini would be fired if caught was well known since 2004.  DMF ¶21.

Company provided and condoned use of a lunch room which was actually part of the male locker rooms and bathrooms.  DMF ¶17.  Company periodically provided catered meals to the employees at this male-only locker room. DMF ¶28.  The employee coffee club and Gatorade were both located in the male-only lunch room.  DMF ¶27.  This systemic exclusion

from her co-workers resulted in systemic isolation and denial of the opportunity to participate in workplace comradary, socialization, communication of new information, and/or banter, all of which naturally accompany employee meal breaks. Even on the occasions Ms. Gasperini joined in with her male co-workers, she had to be ready to get up and leave her meal on a moment's notice if another male employee needed to shower or change or use the bathroom, or if a supervisor was nearby. DMF ¶¶25-26.  Company cannot deny that Ms. Gasperini, the only female on second shift, was expected to take her meal breaks alone, or otherwise risk being fired.

Secondly, Ms. Gasperini experienced unequal treatment in the access she had to bathroom facilities.  Initially, like her male co-workers, Ms. Gasperini had access to a bathroom at her immediate work site.  In May 2006, without any advanced notice, Company decided to block access to the only female bathroom located at Ms. Gasperini's work area.  DMF ¶30. The door handle was actually removed.  DMF ¶30.  This was Ms. Gasperini's bathroom for the nearly twelve years that she worked as a fuel handler in the coal yard.  DMF ¶33.  This abrupt change for no apparent legitimate reason, brought a good deal of stress to Ms. Gasperini who suffers from chronic bladder condition which causes frequency and urgency in urination.  DMF ¶36. The re-located bathroom made it difficult for Ms. Gasperini to reach in time due to her bladder problem and fear of reprimand for leaving her job post.  DMF ¶37.  Ms. Gasperini who worked in the coal yard, was now required to walk close to 250 feet to the powerhouse to access the nearest bathroom.  DMF ¶34.  The further distance was not a mere inconvenience since Ms. Gasperini suffers from a chronic bladder condition which requires her to have immediate access to a bathroom at all times. DMF ¶36.

Ms. Gasperini was understandably angry and suspicious as to the reason for the change. As the only female on that shift, and as this action only affected her, Ms. Gasperini quite naturally felt targeted.   DMF ¶86.  She complained to union representative and her supervisor to no avail.  DMF ¶38. Only after Ms. Gasperini wrote a letter to OSHA and Company received an OSHA determination that this Company action was illegal, did the company quickly nail a UNISEX sign to a male-only supervisor's bathroom located in her work area. DMF ¶39.

Thirdly, Ms. Gasperini experienced unequal treatment in the access she had to locker facilities.  Initially, like her male co-workers, Ms. Gasperini had a locker (with bathroom facility) (engineering trailer locker) which was located at her immediate work site.  She had this

locker since 1995.  DMF ¶54.

In May 2006, when Company decided to block access to Ms. Gasperini's bathroom, Company simultaneously closed the adjacent female locker.  DMF ¶40.  Curiously, female co-workers who worked the day shift still had access to it, as it remained open until around 3:00 p.m., the time Ms. Gasperini would be just starting her shift.  DMF ¶49.  Ms. Gasperini's re-assigned locker was now located in the powerhouse, close to 250 feet away from her work area DMF ¶41. In Company's attempt to argue that Ms. Gasperini should not have complained about her locker being re-assigned to the powerhouse location as she used to have it there, Company fails to include the fact that although during the years 1989 through 1995, Ms. Gasperini's locker was indeed located at the powerhouse, it was relocated to the engineering trailer locker when her department changed to fuel handling at the coal yard.  DMF ¶55. There was no advanced notice given to Ms. Gasperini regarding the locker move.  DMF ¶40. Antero Oliveira's blanket assertion that he on his own decided to "consolidate" due to "economics", without more, is just not a legitimate reason for this adversary Company action. DMF ¶49

Ms. Gasperini's bathroom, which she relied upon multiple times during her shift and her locker where she stored food, where she showered and changed, were now quite a distance from her work area.  Ms. Gasperini had been content with her locker located at the engineering trailer for the last twelve years.  DMF ¶51.  Besides the inconvenient location, Ms. Gasperini understandably hated her re-assigned locker.  At night the locker became very cold, and did not have hot water.  DMF ¶¶44,45.  She complained to no avail to her union representative and union president.  DMF ¶¶42,43  More importantly, Ms. Gasperini had safety issues with her newly assigned locker and complained about these to Company.  Eventually, she sent a letter to OSHA documenting her concerns such as lack of safety exit, no working exhaust fan, a faulty air conditioning unit, and no hot water. DMF ¶52.  Company finally added a space heater but the shower still had no hot water.  Company's response to the hot water issue was to allow Ms. Gasperini to take a shower in the male supervisors' locker room.  DMF ¶53.  However, Ms. Gasperini quite understandably could not comfortably take a shower in there with the fear that a male supervisor could randomly walk in. DMF ¶54.

Viewing the manner in which Company re-assigned her locker, with no documented legitimate reason, and the manner in which Company failed to adequately address her quite

natural concerns, it became starkingly clear to Ms. Gasperini that this was unfair and discriminatory treatment.  DMF¶ ¶84-87.  As documented in her therapy records, Ms. Gasperini's distress and anxiety over this situation only grew worse from May 2006 forward. DMF ¶¶84-87, 121.

On November 19, 2006, Ms. Gasperini was assigned to the Bulldozer Operator position. DMF ¶56.  Ms. Gasperini had been a Bulldozer Operator since 1998.  DMF ¶57.  Ms. Gasperini's supervisor, Antero Oliveira, considered her to be a good, competent operator, and stated that she performed those duties well. DMF ¶58.  The coal pile that night was high. DMF ¶59.  There were many instances where a bulldozer might get stuck on a pile or get into a hole created by the hopper.  DMF ¶70.  Most of the time, workers were not disciplined for a stuck bulldozer.  DMF ¶71-71.  On the night of November 19, 2006, the ship, ATLAS was unloading coal. DMF ¶60. The ATLAS was known to be a fast-dumping ship. DMF ¶61.  It was generally known that the bulldozer operators did not like for the coal pile to get too high, especially when a ship was dumping.  DMF ¶60.  On this night, it was dark, and Ms. Gasperini could not keep pace with the ATLAS. DMF ¶62.  Ms. Gasperini utilized her two-way radio and called the ship every fifteen minutes to instruct it to stop dumping, but got no response DMF ¶63.  Ms. Gasperini also attempted to solicit back-up assistance from co-workers with her two-way radio and her cell phone and initially got no response. DMF ¶.65 Fearing for her safety, Ms. Gasperini telephoned George Alfonso, the on-call supervisor, at his home.  DMF ¶62.  Ms. Gasperini felt that there was insufficient space atop for her to safely negotiate the bulldozer without assistance.  DMF ¶62.   Ms. Gasperini's genuine fear that she was put in a life threatening position triggered her Post Traumatic Stress Disorder (PTSD).   DMF ¶¶84, 85 When a worker felt unsafe on the pile, he was expected to call his supervisor.  DMF ¶64. Instead of providing Ms. Gasperini the necessary support, for example, providing a second bulldozer operator on the pile until Ms. Gasperini was confident in the conditions, Mr. Alfonso berated and belittled Ms. Gasperini for not being able to negotiate the pile, and instructed her to go home. DMF ¶68.  Ms. Gasperini being sent home was not a reasonable response. DMF ¶69 If a dozer got stuck, the response of management would be coaching and counseling.  No one was ever sent home for raising safety concerns. DMF ¶71.

Following the incident, Ms. Gasperini was required to temporarily work the 1st shift so that her bulldozing could be "observed" by Company. DMF ¶81.  Company required Ms.

Gasperini's to be "observed" despite her supervisor, Antero Oliveira's opinion that she was a good, competent operator, and performed her duties well. DMF ¶58. Ms. Gasperini quite reasonably felt very upset and belittled in that her skills were called into question in front of all her co-workers. DMF ¶82, although Company subsequently made a determination that Ms. Gasperini had the skills necessary to continue to operate the dozer. DMF ¶89. Shortly thereafter, in response to a grievance Ms. Gasperini filed with her union, on January 17, 2007, the union sent Company a formal letter in support of Ms. Gasperini's safety concerns on the night in question. DMF ¶88.

Despite union support, and oddly, over two months after the incident, on or about January 27, 2997, Company generated a Memorandum to Ms. Gasperini stating that it determined Ms. Gasperini should have been able to operate the bulldozer under the conditions that evening. DMF ¶89 Curiously, this Memorandum was silent as to whether Company investigated into whether Mr. Alfonso provided the necessary support while Ms. Gasperini was on the coal pile, or investigated as to why Ms. Gasperini's calls to her co-workers for assistance were not answered.

Company fails to document any legitimate, non-discriminatory reasons for the unequal treatment Ms. Gasperini received. Taking these material facts in the light most favorable to the Ms. Gasperini, as the nonmoving party, the defendant's motion for summary judgment must be denied.


    **B.** <u>**Retaliation**</u>


Title VII prohibits employers from "discriminat[ing] against any of [their] employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." <u>Sanchez-Rodriguez vs. AT&T Mobility</u>, 673 F.3d 1 at 13, quoting 42 U.S.C. § 2000e-3(a). "A plaintiff establishes a prima facie case for retaliation by showing that : (1) he engaged in protected conduct under Title VII; (2) he experienced an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action." <u>Sanchez-Rodriguez</u>, 673 F.3d at 13 citing <u>Gu v. Bos. Police Dep't, 312 F.3d 6 at 13-14 (1st Cir. 2002)</u> and <u>White v. N.H. Dep't of Corr.</u>, 221 F.3d 254, 262 (1st Cir. 2000). See also <u>Valentin-Almeyda v. Municipality of</u>

Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); <u>Mole v. Univ. of Massachusetts</u>, 442 Mass. 582, 591-592 (2004); <u>Noviello v. City of Boston</u>, 398 F.3d 76, 88 (1st Cir. 2005). See also <u>Pearson v. Mass. Bay Transportation Authority</u>, 2012 U.S. Dist. LEXIS 31101 at 61, quoting <u>Morales-Vallellanes v. Potter</u>, 605 F.3d 27, 36 (1st Cir. 2010) ('a plaintiff alleging workplace retaliation must prove, among other things, that he suffered an 'adverse employment action' on account of a protected activity.' "); <u>Billings v. Town of Grafton</u>, 515 F.3d at 52. (The adverse employment action must be materially adverse); <u>Douglas v. J.C. Penney Co., Inc.</u>, 474 F.3d 10, 15 (1st Cir. 2007) (The "plaintiff needs to prove that protected conduct and an adverse employment action are causally linked.")

"Unlike a discrimination claim, however, a retaliation claim is based upon conduct as opposed to discriminatory motive." <u>Pearson</u>, 2012 U.S. Dist. LEXIS, at 61 citing <u>DeCaire v. Mukasey</u>, 530 F.3d 1, 19 (1st Cir. 2008) (Title VII's "retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct")(quoting <u>Burlington N. & Santa Fe Ry.Co. v. White</u>, 548 U.S. 53, 63 (2006)). "The anti-retaliation provision is also broader than the substantive discrimination provision because the 'conduct need not relate to the terms or conditions of employment to give rise to a retaliation claim.'" <u>Pearson</u>, 2012 U.S. Dist. LEXIS at 62 quoting <u>Billings</u>, 515 F.3d at 54; accord <u>Morales-Vallellanes,</u> 605 F.3d at 36 (quoting <u>Billings</u>,15 F.3d at 54). "The inquiry under Title VII is also an objective one wherein the plaintiff must show that a reasonable employee would have found the action materially adverse." <u>Pearson</u>, 2012 U.S. Dist. LEXIS 31101 at 62 citing <u>Burlinton Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53 (2003); <u>King v. City of Boston</u>, 71 Mass. App.Ct. 460 (Mass.App.Ct. 2008); <u>Billings</u>, 515 F.3d at 52.

"Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to demonstrate that there was a non-discriminatory reason for the adverse employment action. If the employer demonstrates such a reason, the burden returns to the plaintiff to show that the non-discriminatory reason was merely a pretext for discrimination." <u>Sanchez-Rodriguez</u>, 673 F.3d at 13-14, citing <u>Douglas</u>, 474 F.3d at 14.

Assuming the employer provides legitimate reason for its adverse employment actions, the issue becomes whether these proffered reasons were just pretext for discriminatory or relatiatory conduct.

Like Title VII, chapter 151B contains a similar retaliation prohibition. See <u>Billings</u>, 515

F.3d 39, 52, n.12 Mass.Gen.L. c. 151B § (4)(4A).  G.L. c. 151B, § 4(4), which prohibits retaliation by making it unlawful "[f]or any person, employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five. G.L. c. 151B, § 4(4).

To prove a claim of retaliation under G.L. c. 151B, a plaintiff must show that he or she reasonably and in good faith believed defendant engaged in discriminatory conduct; that he or she notified defendant by opposing or complaining about discriminatory practices; that defendant took an adverse action against him or her; and that defendant's desire to retaliate was a determinative factor in its adverse action.  See MacCormack v. Boston Edison Co., 423 Mass. 652 (1996); (adverse action must materially disadvantage plaintiff; must be causal link between filing complaint and adverse action); Tate v. Dept. of Mental Health, 4109 Mass.356, 364-365 (1995) (desire to retaliate must be a determinative factor). Urrea v. New England Tea & Coffee Co., No. 96-EM-750, slip.op. at 3-4) (notice requirement)

Pretext analysis under Mass.G.L. c. 151B is less burdensome than under Title VII. "151B appears slightly less stringent, in that it would allow a plaintiff to overcome a motion for summary judgment if the plaintiff shows that just one of the proffered reasons as was pretextual." Douglas, 474 F.3d at 14 n.2.

"To defeat summary judgment in a retaliation case, '[a] plaintiff must point to some evidence of retaliation by a pertinent decisionmaker.' " Sanchez-Rodriguez, 673 F.3d  at 15 quoting Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997).

Ms. Gasperini was employed by the Defendant and its predecessor companies for eighteen years. During the course of her employment with Company, Ms. Gasperini complained to her supervisors and union representatives multiple times regarding what she perceived to be disparate treatment.  DMF ¶¶29, 38, 42-44,74, 78, 88.  Ms. Gasperini sent a letter to OSHA in May 2006, DMF  ¶52 and filed MCAD Charges of Discrimination against Company in 2007. DMF ¶29.

It is undisputed that Company was well aware of Ms. Gasperini's prior discrimination lawsuit against Company's predecessor, and specifically brought the issue up during a meeting where Ms. Gasperini just wanted her safety concerns heard. DMF ¶78.  As soon as Company became aware of the fact that Ms. Gasperini was beginning to challenge her unequal treatment

under Company's employ, Company began a course of dealing with Ms. Gasperini that became increasingly adverse, retaliatory, and which ultimately forced her to take medical leave.

### a.  Ms. Gasperini Engaged in Protected Conduct

#### i.    Ms. Gasperini Reasonably and in Good Faith Believed Company Engaged in Discriminatory Conduct

Ms. Gasperini reasonably and in good faith believed Company engaged in discriminatory conduct toward her when Company provided a male-only lunch area to the exclusion of Ms. Gasperini, the only female who worked on second shift, when Company denied her access to a bathroom at her work-site, citing "economics" when the male-only bathroom remained open, and when Company likewise forced her to re-locate to a locker that was more inconvenient and sub-standard without business necessity, and when Company sent her home instead of providing the necessary back-up support when she feared for her safety at the 2006 coal pile incident, and then treated her in an unequal and disparaging manner the following day.

Ms. Gasperini's good faith belief that she was discriminated against is well-documented in her therapy records which describe Ms. Gasperini's emotional and physical illness due to her workplace conditions.  DMF ¶¶84-87, 111, 116-117,121.

#### ii.    Ms. Gasperini Notified Company by Complaining About the Practices

Company was well aware that Ms. Gasperini was unhappy about her workplace conditions.  She complained multiple times about not being able to eat with her co-workers without threat of being fired. DMF ¶29   She also complained multiple times about her bathroom and locker room being re-located.  DMF ¶¶38-39, 42-44, 52

 After the 2006 bulldozer incident, she brought her workplace concerns to human resource personnel Karen Kinder, DMF¶ ¶74-77, and then Lillian Pope and Bob Rossi, DMF ¶¶78-80 who all treated her with contempt and hostility. With regard to the 2006 bulldozer

incident, Ms. Gasperini brought her concerns to the union, which in turn, offered it support for her actions and notified Company that its actions in the bulldozer incident appeared retaliatory. DMF ¶88.

### iii.    Plaintiff experienced adverse employment action

Once it was evident to Company human resource personnel that Ms. Gasperini felt Company was discriminating against her, and given that Company was well aware of the fact that Ms. Gasperini successfully sued Company's predecessor for sex discrimination in the past, Company began a course of dealing with Ms. Gasperini that materially altered her conditions of employment to her detriment, and set a consistent course of action to set up Ms. Gasperini for employment termination.

Immediately following the 2006 bulldozer incident, Ms. Gasperini had a meeting with Karen Kinder, Company's Senior Human Resources Generalist, where she was questioned about the incident.  DMF ¶74.  During her meeting where Ms. Gasperini attempted to voice her concerns about her treatment the prior evening, she was harassed and made to feel that she was ill-equipped to do her job.  DMF ¶74.  She was screamed at and constantly interrupted by Ms. Kinder. DMF ¶¶75, 77.   Following this meeting, Ms. Kinder's hostility was evident when she unjustifiably sent a memo to several managers stating Ms. Gasperini's had "poor performance" as a fuel handler and recommended that she be given an Employee Decision Day. DMF ¶76.  Ms. Kinder's memo is also in direct contradiction to her direct supervisor's assessment that she was competent and good at her job. DMF ¶6.

Following the Kinder meeting, Ms. Gasperini sought assistance from human resource personnel, Lillian Pope and Bob Rossi. DMF ¶78.  Ms. Gasperini's workplace complaints were summarily dismissed, DMF ¶80, and her 1991 lawsuit against company's predecessor was angrily brought up.  DMF ¶79.

 On December 1, 2006, only two weeks after the bulldozer incident, Company issued a written warning against Ms. Gasperini for leaving her conveyor unattended, on a night nearly two months prior, even though a coal spill did not occur. DMF  ¶¶90, 93  Ms. Gasperini had gone briefly to observe how to put out a coal pile fire out, something she needed to be trained to do. DMF  ¶90.  Granted, Ms. Gasperini was away from her station.  However, the issuance

of the written warning is suspect given its timing, coming on the heels of the November 2006 bulldozer incident.  It is also suspect given that it was a known practice that people would leave their conveyor areas unattended for things like a quick bathroom break or quick bite to eat and they generally were not disciplined for leaving the area. DMF  ¶91.  There was at least one other incident documented where a male co-worker, Mark Huck, was not disciplined, and even though he, unlike Ms. Gasperini, did have a coal spill.  DMF  ¶92.

On or about August 3, 2007, Ms. Gasperini was <u>suspended</u> and ordered to take an Employee Decision Day due to an incident where she refused to provide identification to a security guard.  There were many facts in dispute surrounding the security guard incident, DMF ¶¶94-102, and Ms. Gasperini filed a Grievance with her union on the appropriateness of the suspension and ultimately lost at arbitration.  Even assuming *arguendo* that her suspension for this incident was appropriate, and not a set up for future termination, Company's hostile and harassing treatment of Ms. Gasperini upon her return from Employee Decision Day was completely unacceptable and in direct retaliation against Ms. Gasperini for engaging in protective conduct.

Following her August 3, 2007 suspension, Ms. Gasperini was experiencing chest pains and sought medical assistance from her primary care physician, Joan Harrison, M.D.  DMF ¶104.  Dr. Harrison believed her chest pains were caused by anxiety due to work related stress and instructed her to remain out of work at that time.  DMF ¶105.

Ms. Gasperini returned to work on September 2, 2007.  DMF ¶105.   In order to be allowed back to work, Ms. Gasperini was required to fill out an Action Plan Questionnaire. DMF ¶105.   Ms. Gasperini's first draft was written with the assistance of her Union Representative, Michael Alexander, Jr. DMF ¶107.  It was Mr. Alexander's opinion that these answers should have been acceptable.  DMF ¶107.  Ms. Gasperini's second draft was written after consulting with union legal counsel.  DMF ¶108.  Mr. Oliveira rejected the second draft as well. DMF ¶108-109.  Mr. Oliveira's hostility toward Ms. Gasperini and was evident in that he unreasonably dictated what he wanted to be written. DMF ¶110.   Mr. Oliveira's hostility against Ms. Gasperini was evident in that Ms. Gasperini was unreasonably forced to revise her answers four or five times simply because Antero Oliveira did not like her answers.  DMF ¶109.  This incident only served to exacerbate Ms. Gasperini's work-related physical and emotional symptomology. DMF¶111.

Immediately following this incident, in September 2007, a company work truck was damaged when someone dispensed three gallons of diesel fuel into the non-diesel gasoline tank. DMF ¶112.   Ms. Gasperini had logged that she put gasoline into the vehicle that night, and then a co-worker made an off-the-cuff remark suggesting that Ms. Gasperini put the diesel in the truck. DMG ¶112.  Any number of workers had access to the truck on the night in question. DMF ¶113.  However, by the next day, it was rumored that Ms. Gasperini had put the diesel fuel into the truck. DMF ¶112.  In light of the hostile circumstances surrounding the Action Plan Questionnaire that she experienced upon her return to work, Ms. Gasperini reasonably felt she might have been "set up" in this incident. DMF ¶117.

Company instituted a criminal investigation.  DMF ¶114.  As part of its criminal investigation, Company Security Investigator interrogated Ms. Gasperini for approximately five (5) hours. During said interrogation, Ms. Gasperini felt intimidated and harassed.  DMF ¶114.   She was even asked to take a lie detector test which she gladly accepted.  DMF ¶114.  Granted, her male co-workers in that department were questioned, but not to the extent of Ms. Gasperini.  Ms. Gasperini's interrogation lasted at least two hours longer than the others. DMH ¶115.  Ultimately, Company could not prove who put the diesel in the truck and no disciplinary action was taken.

This whole incident, suspect particularly because of its timing, occurring on the heels of her return from suspension, exasperated Ms. Gasperini' medical symptoms including chest pains, shortness of breath, and panic episodes.  DMF ¶117.   The hostile and disparate treatment that Ms. Gasperini underwent in this investigation was retaliation against her for engaging in protective conduct.

One month later, on October 2, 2007, while Ms. Gasperini was still out of work on medical leave, Company sent Ms. Gasperini a letter wrongfully accusing her of "berating" another co-worker for cooperating with the company's investigation into Ms. Gasperini's MCAD Charge.  In the letter Company stated it would "not tolerate any such actions" and that she could be subject to "termination of employment." DMF ¶118.  In actuality, Ms. Gasperini, believing the co-worker lied in his statement for the MCAD, merely telephoned the co-worker and questioned him on it.   DMF ¶¶119, 120. Company documents indicate the co-worker merely notified the supervisor that Ms. Gasperini telephoned him at home.  DMF ¶¶119, 120. Considering that Ms. Gasperini was questioning his truthfulness in a matter very personal to

her, and that she was not at work to question him, it was quite reasonable for her to want to telephone him to question him on what he said.  Company's unjustifiable warning letter is another example of retaliatory actions against Ms. Gasperini, designed to intimidate her and set her up for termination.

Thereafter, Ms. Gasperini became violently ill with diaarhea and vomiting and by October 3, 2007, Ms. Gasperini was regularly experiencing chest pains, bouts of frequent diarrhea, increased frequency of urination beyond her norm on medication due to her increased anxiety at work.  Ms. Gasperini continued medical leave.  DMF ¶117.


### iv.    Company's  Desire to Retaliate was Determinative Factor in its Adverse Action


Despite occasional minor work related minor mishaps, Ms. Gasperini was a valued employee for Company and its predecessors for nearly eighteen years. ¶¶1-12.  In May 2006, Ms. Gasperini's bathroom was unfairly taken away and her locker-room was unfairly re-assigned, and she started to assert the unequal treatment she received at work, including her disparate treatment at meal breaks.¶¶38-39.  Then, in November 2006, Ms. Gasperini felt dangerously unsafe on a coal pile, and requested assistance from her supervisor and co-workers and did not receive the assistance or support she requested.  ¶¶62-68.  Instead, she was belittled and treated with hostility for doing what was expected of any employee when they felt unsafe, she asked for help.  At this time, through comments made by human resource personnel, Company's desire and intent to retaliate against her precisely because she had consistently complained about her work conditions became starkingly clear to Ms. Gasperini. Not only was Company unsympathetic to her concerns. Company made outwardly hostile comments about her past discrimination suit against Company's predecessor. ¶¶74-80.  Ms. Gasperini's work conditions only worsened from that point forward, as Company sought to set her up for employment termination through series of measured, calculated disciplinary measures, coupled with harassment and intimidation.

The totality of Company's conduct over its course of dealings with Ms. Gasperini point to retaliation. Viewing these material facts in the light most favorable to the Ms. Gasperini, as the nonmoving party, the defendant's motion for summary judgment on both Counts I and II must be denied.

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the defendant's motion for summary judgment as to all counts of Plaintiff's complaint be denied.

Plaintiff,
Bunnie M. Gasperini,
By her attorney,

/s/ Gary P. Howayeck
Gary P. Howayeck, Esq.
Law Office of Gary P. Howayeck, P.C.
209 Bedford Street, Suite 402
Fall River, Massachusetts 02720
BBO # 630053
Tel.:(508) 676-6666
Facsimile: (508) 674-3610
Email: howayeck@aol.com

Dated: June 5, 2012

## Certificate of Service

I, Gary P. Howayeck , hereby certify that on this 5th day of June 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send an electronic notice to the registered participants identified on the Notice of Electronic Filing, and further certify that paper copies will be sent to those indicated as non-registered participants.

*/s/ Gary P. Howayeck*
Gary P. Howayeck